1

2

3

4

5

6

7

8                                 UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DANIEL ACCOSTA,[1]                              No.  2:12-cv-2619 MCE KJN P

12                      Petitioner,

13           v.                                       FINDINGS & RECOMMENDATIONS

14    GARY SWARTHOUT, Warden,

15                      Respondent.

16

17    I.  Introduction

18           Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for second

20    degree robbery and evading a police officer.  Petitioner claims that appellate counsel provided

21    ineffective assistance of counsel on direct appeal by failing to challenge the sufficiency of the

22    evidence supporting the gun use enhancement, and that the trial court erred by refusing to give a

23    defense pinpoint jury instruction that the firearm must be real and not a replica.  After careful

24    review of the record, this court concludes that the petition should be denied.

25    ////

26    _____

27    [1]  As noted by respondent, within petitioner's filings, petitioner spelled his last name "Accosta,"
      as well as "Acosta."  In state court proceedings, petitioner's name was spelled with only one "c,"
      "Acosta."  See, e.g., ECF No. 1 at 91.)  The court adopts petitioner's spelling used in the caption

28    of his petition.

1   II.  <u>Procedural History</u>

2          On June 1, 2009, a jury found petitioner guilty of second degree robbery and evading a

3   police officer, and found true the allegation that petitioner personally used a handgun during the

4   robbery.  (Clerk's Transcript ("CT") 194-95.)  Petitioner was sentenced to 15 years in state

5   prison.

6          Petitioner appealed the conviction to the California Court of Appeal, First Appellate

7   District.  The Court of Appeal affirmed the conviction on January 5, 2011.  (Respondent's

8   Lodged Exhibit ("LE") 8.)

9          Petitioner did not file a petition for review in the California Supreme Court.

10          On December 27, 2011, petitioner filed a petition for writ of habeas corpus in the Solano

11   County Superior Court.  (ECF No. 14-1.)  On February 16, 2012, the Solano County Superior

12   Court denied the petition.  (ECF No. 1 at 91-92.)

13          Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, First

14   Appellate District, on April 26, 2012.  (ECF No. 14-2.)  The California Court of Appeal denied

15   the petition on April 30, 2012.  (ECF No. 1 at 95.)

16          On May 22, 2012, petitioner filed a petition for writ of habeas corpus in the California

17   Supreme Court.  (ECF No. 14-3.)  The California Supreme Court denied the petition on August

18   22, 2012.  (ECF No. 1 at 97.)

19          Petitioner filed the instant petition on October 23, 2012.  (ECF No. 1.)

20   III.  <u>Facts</u>[2]

21          In its unpublished memorandum and opinion affirming petitioner's judgment of

22   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

23   following factual summary:

24                  An information was filed on February 19, 2008, and it charged
                 defendant with committing second degree robbery (§ 211), and
25                  evading an officer with willful disregard (Veh.Code, § 2800.2,
                 subd. (a)).  The information also charged defendant with personal

26

27   [2]  The facts are taken from the opinion of the California Court of Appeal for the First Appellate
    District in <u>People v. Acosta</u>, No. A127341 (January 5, 2011), a copy of which was lodged by
28   respondent as Exhibit 8 on October 17, 2013.

2

use of a firearm pursuant to section 12022.5, subdivision (a)(1), and section 12022.53, subdivisions (b) and (e)(1), as to the robbery charge. The information further alleged that defendant had served two prior prison terms within the meaning of section 667.5, subdivision (b).

Defendant had a jury trial. He conceded guilt of the charged offenses, and contested only the gun use enhancement allegation.

At trial, Weldon Nathan Prestwich testified that he was robbed while working as a cashier at a gas station. He stated that on November 20, 2007, defendant, who was unmasked, came into the gas station. Preston noticed that he was wearing skeleton-print gloves, and driving a light blue Cadillac. Defendant purchased $5 of gas for his blue Cadillac.

Five to ten minutes after defendant drove away in his light blue Cadillac, Prestwich testified that a masked man entered the station and demanded money. The man pointed a chrome gun with brown plastic grips at Prestwich. Prestwich opened the cash drawer and the man, who was wearing skeleton-print gloves, reached in and took $500 from the drawer. Prestwich followed the man from the store and saw him get into a light blue Cadillac parked in front of a nearby business. Prestwich called the police.

The police responded and saw a light blue Cadillac on the freeway and followed it. The Cadillac left the freeway and the uniformed officers, who were in marked vehicles, activated their lights and sirens; a chase ensued. During the pursuit, the Cadillac exceeded the speed limit and ran a number of stop signs and red lights. At one point during the chase, two officers in separate cars heard a sound like a gunshot come from defendant's car, although none of the officers saw a muzzle flash or saw defendant throw anything from the vehicle. Eventually the Cadillac was stopped and the police apprehended defendant. Defendant had skeleton-print gloves in his possession and $388, but the police did not find a gun or ammunition.

Police brought Prestwich to the scene and he identified defendant as the person who had come into the gas station. The police took defendant into custody and interviewed him. The jury saw a videotape of this interview. During the interview, defendant made equivocal statements about whether he had a gun and whether he had thrown the gun from his vehicle during the chase. When asked why he tossed the gun out of the car, he responded, "There was no gun." The police responded that there was one and he tossed it and he said, "Yeah. I know...." The police reiterated that he tossed the gun and defendant replied, "Yeah." Defendant told the police that he could not tell them where he tossed the gun. Subsequently, defendant stated, "No. But, the thing is, when you all find the gun, I know you all is, is just, it's a dead bang case. You all, you all really don't need nothin' from me." Defendant repeated that he did not know where he tossed the gun. Subsequently, defendant stated that the gun "was fake." At the end of the interview, when asked

3

again where the gun was, defendant answered that he did not know where he threw it out.

At trial, Police Officer Joseph McCarthy testified that he did not conduct a test on defendant's hands for gunshot residue. An expert for the defense, Rick Williams, testified that he purchased a replica firearm that matched the description of the robber's gun provided by Prestwich; this replica was defense's exhibit A. The replica gun was a starter pistol with a plugged muzzle that could not fire projectiles, but was designed to fire blanks instead. Prestwich was shown the replica in exhibit A; he thought it was a real firearm.

Police Officer Joshua Coleman testified. He stated that the sound of a real firearm and a replica gun that shoots blanks is similar. He explained that starter pistols do not shoot a projectile. He testified that defendant's exhibit A, which had a closed muzzle, would not fire a projectile. Williams, also testified that the difference between a starter pistol and a real gun was that "the barrel is plugged and the cylinder portion of it, if it's closed off is not bored all the way through so you can't put a real bullet into it."

At the close of evidence, defendant requested that the court give an instruction "something to the effect that the firearm must be real and not a replica firearm in order to find" the gun enhancement to be true. The court denied this request, explaining that the definition of a firearm contained in other instructions was adequate.

During closing argument, the prosecutor stated: "The issue in this case is whether or not the defendant used a real gun during this robbery." Defendant's counsel agreed with the prosecutor on this point and stated: "Now, this case is, I will agree with [the prosecutor], it is about one thing. It's did the prosecution prove beyond all reasonable doubt that the gun that was used during the robbery on November 20, 2007[,] was real. That's it."

The trial court gave the jury a number of instructions. Specifically, the court gave CALCRIM No. 3146, which states as follows: "If you find the defendant guilty of [robbery], you must then decide whether the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. [¶] A firearm is any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion. [¶] A firearm does not need to be in working order if it was designed to shoot and appears capable of shooting. A firearm does not need to be loaded. [¶] Someone personally uses a firearm if he or she intentionally does any of the following: [¶] 1. Displays the firearm in a menacing manner; [¶] 2. Hits someone with the firearm; [¶] OR [¶] 3. Fires the weapon. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

////

4

The jury found defendant to be guilty of the charged offenses and found the firearm allegation as to count one to be true. Defendant admitted the two prior prison term convictions. The court sentenced defendant to 15 years in prison.

(People v. Acosta, slip op. at 2-5.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

5

1   specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S.

2   Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).

3   Nor may it be used to "determine whether a particular rule of law is so widely accepted among

4   the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct.

5   Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said

6   that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S.

7   70, 77 (2006).

8       A state court decision is "contrary to" clearly established federal law if it applies a rule

9   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

10  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

11  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

12  writ if the state court identifies the correct governing legal principle from the Supreme Court's

13  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3] Lockyer v.

14  Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002

15  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

16  court concludes in its independent judgment that the relevant state-court decision applied clearly

17  established federal law erroneously or incorrectly.  Rather, that application must also be

18  unreasonable." Williams, 529 U.S. at 412.  See also Schriro v. Landrigan, 550 U.S. 465, 473

19  (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

20  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

21  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

22  'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v.

23  Richter, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

24  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

25  must show that the state court's ruling on the claim being presented in federal court was so

26

27  [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1  lacking in justification that there was an error well understood and comprehended in existing law

2  beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87.

3      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4  court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

5  527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

6  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

7  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

8  considering de novo the constitutional issues raised.").

9      The court looks to the last reasoned state court decision as the basis for the state court

10  judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

11  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

12  previous state court decision, this court may consider both decisions to ascertain the reasoning of

13  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

14  federal claim has been presented to a state court and the state court has denied relief, it may be

15  presumed that the state court adjudicated the claim on the merits in the absence of any indication

16  or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. This

17  presumption may be overcome by a showing "there is reason to think some other explanation for

18  the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797,

19  803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

20  but does not expressly address a federal claim, a federal habeas court must presume, subject to

21  rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct.

22  1088, 1091 (2013).

23      Where the state court reaches a decision on the merits but provides no reasoning to

24  support its conclusion, a federal habeas court independently reviews the record to determine

25  whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v.

26  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

27  review of the constitutional issue, but rather, the only method by which we can determine whether

28  a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no

1   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

2   reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

3       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

4   Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze

5   just what the state court did when it issued a summary denial, the federal court must review the

6   state court record to determine whether there was any "reasonable basis for the state court to deny

7   relief." Richter, 131 S. Ct. at 784. This court "must determine what arguments or theories . . .

8   could have supported, the state court's decision; and then it must ask whether it is possible

9   fairminded jurists could disagree that those arguments or theories are inconsistent with the

10  holding in a prior decision of [the Supreme] Court." Id. at 786. The petitioner bears "the burden

11  to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v.

12  Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S. Ct. at 784).

13      When it is clear, however, that a state court has not reached the merits of a petitioner's

14  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15  habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

16  F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

17  V.  Petitioner's Claims

18      A.  Pinpoint Instruction

19      Petitioner claims that the trial court erred by refusing to give a defense pinpoint jury

20  instruction that the firearm must be real and not a replica, in violation of his Sixth and Fourteenth

21  Amendment rights to present a defense and to a fair trial. Respondent argues that the requested

22  instruction merely repeated the instruction that the firearm must be real, and that in any event, the

23  jury was well-informed of the difference between real and replica firearms, and further instruction

24  would have been duplicative.

25      The last reasoned rejection of petitioner's claim is the decision of the California Court of

26  Appeal for the First Appellate District on petitioner's direct appeal. The state court addressed this

27  claim as follows:

28  ////

8

## I. Pinpoint Instructions and Principles of Law

A trial court is required to instruct a jury on the general principles of law that are relevant to the issues raised by the evidence in a given case. (People v. Valdez (2004) 32 Cal.4th 73, 115.) In addition, "'a defendant has a right to an instruction that pinpoints the theory of the defense.'" (People v. Roldan (2005) 35 Cal.4th 646, 715, disapproved on different grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)

"A pinpoint instruction 'relate[s] particular facts to a legal issue in the case or "pinpoint[s]" the crux of a defendant's case, such as mistaken identification or alibi.' [Citation.]" (People v. Ward (2005) 36 Cal.4th 186, 214.) Pinpoint instructions are designed to discuss a theory, not specific evidence. (People v. Wright (1988) 45 Cal.3d 1126, 1137.) Pinpoint instructions must be given on request only when there is substantial evidence to support them and when they are not argumentative or duplicative. (People v. Stanley (2006) 39 Cal.4th 913, 946.) We review de novo whether the instructions correctly state the law. (People v. Posey (2004) 32 Cal.4th 193, 218.)

The failure to include a pinpoint instruction requires reversal if it is "reasonably probable that had the jury been given defendant's proposed pinpoint instruction" it would have come to a different conclusion. (People v. Earp (1999) 20 Cal.4th 826, 887.) Defendant contends that harmless error can never be applied and cites federal cases. (E.g., United States v. Escobar De Bright (9th Cir. 1984) 742 F.2d 1196, 1201 [held trial court erred when it refused to instruct jury on the defense theory that the defendant could not be found guilty if she had "conspired" only with a government agent and the error was reversible per se].) We do not agree that the alleged error, here, is subject to per se reversal. Defendant acknowledges that California cases have held that harmless error under People v. Watson (1956) 46 Cal.2d 818, 836 applies. (See, e.g., People v. Wright, supra, 45 Cal.3d at pp. 1144-1145.) Here, we are not concerned with harmless error because we conclude the trial court did not commit instructional error.

## II. No Error

The sole issue before the jury was whether defendant had used a real firearm when committing the robbery, as he admitted the charges of robbery and evading police officers. At trial, defendant argued that the gun seen by Prestwich was a replica, or a "starter" gun, rather than a real firearm. Defendant submitted exhibit A, a realistic replica firearm resembling the gun described as used by the robber. Exhibit A was a starter pistol with a plugged muzzle that could not fire projectiles; it was designed to fire "blanks" instead.

9

Defendant requested that the court give an instruction, which would provide "something to the effect that the firearm must be a real and not a replica firearm in order to find" the gun enhancement to be true. The record amply shows that substantial evidence supported such an instruction, as defendant's entire defense was that he did not use a real gun. Thus, the question is whether other instructions given were sufficient to present defendant's theory of defense, making the requested instruction duplicative.

The court gave CALCRIM No. 3146, which states in relevant part: "If you find the defendant guilty of [robbery], you must then decide whether the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. [¶] A firearm is any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion. [¶] A firearm does not need to be in working order if it was designed to shoot and appears capable of shooting. A firearm does not need to be loaded." The instruction specified that the prosecution had the burden of proving each allegation beyond a reasonable doubt.

This instruction told the jurors that, if they believed defendant's argument that the firearm used was not real and did not discharge a projectile, they could not find the gun enhancement true. Thus, the instructions given were correct and complete and instructed the jury as to what the prosecution needed to show for the jurors to find that defendant personally used a real, rather than a replica, firearm during the robbery. Accordingly, we conclude that the lower court did not err by refusing to give defendant's requested instruction because it was duplicative or redundant. (People v. Stanley, supra, 39 Cal.4th at p. 946.)

Defendant acknowledges that the instruction given correctly states the law, but he argues that the requested instruction was not duplicative, but would have directed the jury's attention to the theory of his defense. He claims that it would have directed the jury's attention to whether the gun was a real firearm or a replica.

Defendant contends that the present case is similar to the situation in People v. Kane (1946) 27 Cal.2d 693 (Kane). In Kane, the Supreme Court reversed a robbery conviction for failure to give the defendant's pinpoint instruction that advised the jury of the defense that the alleged victim was an accomplice. (Id. at p. 698.) The court explained that the defendant "was entitled to have the jury advised directly and clearly as to the law applicable to the defense to the charge of robbery in order that [the jurors] should have clearly in mind that the taking, even though it was a display of force, to constitute robbery, must have been actually against the will of [the alleged victim], not with her connivance or abetment, and not merely against the will of the owner of the money. The essential, and to a layman somewhat fine, distinction between robbery and grand theft, the definitive attributes of an accomplice [citation], and the application of the doctrine of reasonable doubt to the most important and difficult question presented to the jury, should not have been left either wholly unexplained or derivable only from

inference." (Id. at p. 699.) The court concluded, "Since defendant admittedly used some substantial force in taking the money the record seems to us to afford reasonable support for the defendant's contention that the jury may have been confused and thought he was guilty of robbery whereas in truth they were convinced beyond a reasonable doubt only of such facts as made him guilty of grand theft." (Id. at p. 698.)

Defendant argues that the present case is like the situation in Kane as the jury in his case might have been confused as to the fine distinction between a real firearm and a replica firearm. He contends the jury should have been advised as "to the parameters of his defense to the firearm enhancement and the fine distinction between what constituted a firearm under the law and what constituted a replica to which the enhancement was inapplicable." He claims there was no instruction given that made this distinction.

The present case, however, is significantly distinguishable from Kane. In Kane, the instructions did not clarify the difference between robbery and grand theft and did not specify that robbery required the money to be taken against the victim's will and not with the victim's assistance. Thus, the jury in Kane could have convicted the defendant of robbery even if the victim had an understanding with the defendant that he would take the money. In contrast, here, the jury could not have found the gun enhancement true if it concluded that the gun used was not real, because the instruction required the jury to find that a projectile could be fired and defendant argued that the replica gun that he used could not fire a projectile.

Defendant argues that the instruction he requested was critical to his defense because there was evidence that an inoperable firearm also constituted a firearm. He stresses that there was testimony that the replica gun was capable of "firing" blanks, which contained gunpowder. He also emphasizes that the prosecutor referred to the replica gun as "not operable." Additionally, the officers often referred to the replica as a firearm when testifying. He argues that the distinction between what constituted a firearm as a matter of law and a replica firearm was too fine to be left to inference, and defendant was entitled to have this distinction and its legal consequence made explicit.

Defendant's requested instruction did not explain the difference between a real firearm and a replica firearm. Rather, the requested instruction simply told the jury that the firearm must be real and not a replica firearm to find the enhancement true. This requested instruction did not provide the "critical" information that defendant now argues is essential. Moreover, as already stressed, the instruction given was sufficient: If the jury did not believe that the firearm used was muzzled so that it could not discharge a projectile, the jury could not find the enhancement true under the instruction given.

Additionally, we note that the record does not support defendant's argument that the jury might have been confused about the

difference between a real and a replica gun. He complains that the instruction did not specify that a replica was not a firearm. However, as already stressed, the instruction defined a firearm as a device designed to be used as a weapon from which a projectile is discharged or expelled. Under cross examination, Officer Coleman answered, "Correct," when defense counsel stated, "And a starter pistol or a pistol that does not fire a projectile is not a firearm for that purpose, right?" Defense counsel then asked: "So the [replica] pistol you have in front of you with the closed muzzle, that wouldn't fire a projectile, would it?" Coleman replied, "It doesn't appear to."

Defense counsel also asked his firearms expert, Williams, about the difference between the replica gun, a starter pistol, and a real gun. Counsel asked Williams, "Based on your experience with guns, what is the difference between this [starter pistol] and a real gun?" Williams answered, "Well, the barrel is plugged and the cylinder portion of it, if it's closed off is not bored all the way through so you can't put a real bullet into it."

Accordingly, we conclude that the jury was correctly instructed of the definition of a firearm. Defendant's requested instruction did not distinguish any further between a real and replica firearm, and was merely duplicative. Accordingly, we conclude that the trial court did not err in refusing to provide the requested instruction.

(People v. Acosta, slip op. at 5-10.)

To merit federal habeas relief based on an instructional error, petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." See Estelle v. McGuire, 502 U.S. 62, 72 (1991); see also Waddington v. Sarausad, 555 U.S. 179, 191 (2009); Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Moreover, instructional errors must be considered in the context of the instructions as a whole and the trial record. McGuire, 502 U.S. at 72; Kibbe, 431 U.S. at 156; Cupp v. Naughten, 414 U.S. 141, 147 (1973). "Where the alleged error is the failure to give an instruction the burden on the petitioner is 'especially heavy.'" Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992) (as amended) (quoting Kibbe, 431 U.S. at 155). Further, habeas relief is warranted only where the error had a "substantial and injurious effect or influence in determining the jury's verdict." Hedgpeth v. Pulido, 555 U.S. 57, 58, 61-62 (2008) (per curiam) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

////

1       Here, the jury was instructed with CALCRIM No. 3146:

2               If you find the defendant guilty of the crime charged in Count 1,
        you must then decide whether the People have proved the
3               additional allegation that the defendant personally used a firearm
        during the commission of that crime.
4
                A firearm is any device designed to be used as a weapon, from
5       which a projectile is discharged or expelled through a barrel by the
        force of an explosion or other form of combustion.
6
                A firearm does not need to be in working order if it was designed to
7       shoot and appears capable of shooting.  A firearm does not need to
        be loaded.
8
                Someone personally uses a firearm if he or she intentionally does
9       any of the following:

10              1.  Displays the weapon in a menacing manner;

11              2.  Hits someone with the weapon; or

12              3.  Fires the weapon.

13              The People have the burden of proving each allegation beyond a
        reasonable doubt.  If the People have not met this burden, you must
14      find that the allegation has not been proved.

15  (RT 462.)  Thus, the jury was adequately instructed regarding the definition of a firearm, as well

16  as the prosecution's burden of proof.  Kibbe, 431 U.S. at 156 ("The significance of the omission

17  of such an instruction may be evaluated by comparison with the instructions that were given.").

18  CALCRIM No. 3146 defined a firearm as any device designed to be used as a weapon, *from*

19  *which a projectile is expelled or discharged* through a barrel by the force of an explosion or other

20  form of combustion.  (RT 462 (emphasis added).)  Because the jury instruction requires that the

21  weapon have the capability of firing a projectile, the jury could not have found that petitioner

22  used a replica.  Whether or not the firearm was inoperable or unloaded, the distinction here was

23  on whether or not a projectile would or could be discharged.  Petitioner argues that the

24  prosecutor, in front of the jury, "referred to defense Exhibit A, the replica gun, as 'not operable.'"

25  (ECF No. 1 at 45.)  However, petitioner takes the prosecutor's comment out of context.  (RT

26  272.)  At the time the prosecutor made the comment, he was asking the witness, Weldon

27  Prestwich, the cashier at the gas station during the robbery, how close the robber came to

28  Prestwich, by holding the replica pistol out toward the witness.  The prosecutor stated:  "Let's

13

1    say, to be conservative over here, and now so everyone knows, this gun is not operable, it doesn't

2    have any rounds in it?" and Prestwich responded, "Right."  (RT 272.)  The prosecutor was

3    attempting to put the witness at ease because the prosecutor was planning to point the weapon at

4    the witness.

5          Petitioner also contends that Officer Coleman confused the jury by referring to the replica

6    gun, defense Exhibit A, as a firearm.  (ECF No. 1 at 46.)  However, Coleman's reference was

7    brief, and also made in the context of explaining that the exhibit pistol did not have a hollow

8    barrel, that the barrel was plugged, noting the differences between the exhibit pistol and a real

9    firearm.  (RT 192.)  Given the context of his testimony, the jury was not likely to be confused.

10         Finally, petitioner argues that the jury was further confused when Coleman volunteered

11   his belief that there was a Penal Code section enhancing a sentence by a year if a replica gun was

12   used.  (ECF No. 1 at 47.)  Coleman's testimony proceeded as follows:

13
14        Q:  He [petitioner] told you that he's going to get charged with the same thing, whether the gun was fake or real, right?

15        A:  Yes.

16        Q:  And you knew that that was wrong?

17        A:  Yes.

18        Q:  And he said that he had information about an Alameda County case where a person got charged with a fake gun?

19        A:  Correct.

20        Q:  Now, you know that that's not legal, right?

21        A:  As far as getting charged with a fake gun?

22        Q:  Yes.

23        A:  I wouldn't say that it's not legal.  Isn't there a Penal Code that says that you can -- it's an additional year if it's replica firearm?

24        Q:  Not necessarily.

25        A:  No?

26        Q:  Let's limit it to what --

27        A:  That's my understanding.

28

1      Q:  Okay.

2      A:  You're asking me what I know about it.

3      Q.  Let's talk about what Mr. Acosta told you . . . .

4   (RT 300-01.)  First, Coleman's comment was very brief.  Second, jury instruction CALCRIM

5   3146 made clear that petitioner was facing the gun enhancement charge if he possessed a firearm,

6   as defined in the instruction.  Again, the jury could not find petitioner guilty if the jury did not

7   believe the gun was real.

8          Moreover, evidence was adduced at trial supporting petitioner's defense that the weapon

9   was a replica, not a firearm, and explained the differences.  Defense counsel brought in a replica

10  pistol to show the jury.  (RT 191, 370, Defense Exhibit A.)  Defense counsel used the replica

11  pistol to cross-examine the pursuing police officers as well as the robbery victim, Mr. Prestwich.

12         In addition, the jury instruction proposed by defense counsel at the time of trial did not

13  contain a definition of "replica gun."  Rather, as the state court noted, the proposed pinpoint

14  instruction was redundant because it only repeated the court's instruction that to support a gun

15  enhancement, a firearm must be real and not a replica.  Petitioner now claims that the instruction

16  did not relate the firearm definition to petitioner's defense or clearly distinguish between what

17  constituted an 'inoperable' firearm and a replica capable of firing blank cartridges."  (ECF No. 1

18  at 2-3.)  However, defense counsel did not propose such an instruction to the trial court.

19         The jury was also instructed regarding the prosecution's burden of proof and the

20  presumption of innocence.  Additionally, both the prosecution and the defense argued that the

21  issue in this case turned on whether or not petitioner used a real gun.  (RT 394 (prosecutor argued

22  that "The issue in this case is whether or not the [petitioner] used a real gun during this

23  robbery."); RT 409 (defense counsel agreed with the prosecution, stating "Prosecution must prove

24  beyond all reasonable doubt that the gun used during the robbery was real.")

25         For all of the above reasons, the court cannot find that it was error for the trial court to

26  refuse to instruct the jury with the pinpoint instruction proposed by defense counsel.

27         But even assuming it was error to fail to provide the pinpoint instruction, petitioner was

28  not prejudiced in light of the evidence at trial that a real firearm was used in the commission of

                                        15

1    the robbery, including the pursuing police officers' testimony that they heard a gunshot from a

2    real gun during the pursuit of petitioner (RT 191-93; 231-32), as well as the robbery victim's

3    testimony that he had experience with firearms, and that the gun pointed at him during the

4    robbery had a hollow barrel (RT 273-75).  See Brecht, 507 U.S. at 637-38 (petitioner must show

5    that the error "had substantial and injurious effect or influence in determining the jury's verdict");

6    see also Clark v. Brown, 450 F.3d 898, 905 (9th Cir. 2006) (as amended) (holding that an

7    instructional error is subject to harmless error analysis); Bradley v. Duncan, 315 F.3d 1091, 1099

8    (9th Cir. 2002) (holding that the failure to properly instruct the jury is a trial error subject to

9    harmless-error analysis).

10            Accordingly, the state courts' rejection of petitioner's jury instruction claim was neither

11    contrary to, nor involved an unreasonable application of, clearly established federal law as

12    determined by the United States Supreme Court.

13            B.   Ineffective Assistance of Appellate Counsel

14            Petitioner claims that appellate counsel provided ineffective assistance of counsel on

15    direct appeal.  Petitioner argues that the robbery victim's testimony was insufficient to

16    demonstrate the gun was real because he testified that the gun appeared to be of low quality, and

17    had plastic grips, which suggests the gun was not real.  Petitioner also argues that the fact that the

18    victim followed petitioner out of the store, supports an inference that the gun was not real because

19    otherwise the victim would have remained in the store.  Petitioner contends that no gun or

20    ammunition were ever recovered, and that the pursuing police officers did not testify that they

21    "for sure" heard a gunshot.

22            Respondent argues that the California Supreme Court could have reasonably concluded

23    that appellate counsel's performance was not deficient because the evidence supported an

24    inference that the gun was real.  Alternatively, respondent contends that the California Supreme

25    Court could have reasonably concluded that appellate counsel's failure to raise such a claim on

26    appeal did not prejudice petitioner because there was sufficient evidence to support the jury's

27    finding that the gun was real.

28    ////

16

The last reasoned rejection of petitioner's first claim is the decision of the Solano County Superior Court on the petition for writ of habeas corpus.  (ECF No. 1 at 91.)  The superior court addressed this claim as follows:

> Petitioner fails to state a prima facie case for relief for ineffective assistance of counsel.  (*Duvall*, 9 Cal.4th at p. 475).  Petitioner does not provide any facts or reasonably available documentary evidence to show that counsel performed in an objectively deficient manner.  (*Strickland v. Washington* (19845) 466 U.S. 668, 687.)  Judicial scrutiny of an attorney's performance is highly deferential.  (Id. at 698; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.)  Petitioner fails to carry the burden of overcoming the strong presumption that counsel acted reasonably and that "the challenged action might be considered sound trial strategy."  (*Strickland*, 466 U.S. at p. 689 (citing *Michel v. Louisiana* (1955) 350 U.S. 91, 101); *Bunyard*, 45 Cal.3d at p. 1215.)
>
> This petition for writ of habeas corpus is DENIED.

(ECF No. 1 at 92.)

### 1. Ineffective Assistance of Counsel

The United States Supreme Court has determined that a petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial.  Id. at 688-89. To show deficient performance, the petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id. at 690.  Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id.  The initial court considering the claim must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Id.

To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, the petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at

694; see also Richter, 131 S. Ct. at 791 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.").  A court deciding an ineffective-assistance-of-counsel claim need not address both components of the inquiry if the petitioner makes an insufficient showing on one.  Strickland, 466 U.S. at 697.  The Strickland standard also applies to claims of ineffective assistance of appellate counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

2.   Sufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Juan H. v. Allen, 408 F.3d at 1275.

It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The relevant inquiry is not whether the evidence excludes every hypothesis except guilt,

1   but whether the jury could reasonably arrive at its verdict.  <u>United States v. Dinkane</u>, 17 F.3d

2   1192, 1196 (9th Cir. 1994) (quoting <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991)).

3   "The question is not whether we are personally convinced beyond a reasonable doubt.  It is

4   whether rational jurors could reach the conclusion that these jurors reached."  <u>Roehler v. Borg</u>,

5   945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines the sufficiency of the

6   evidence in reference to the substantive elements of the criminal offense as defined by state law.

7   <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

8                    3. <u>Discussion</u>

9          Here, petitioner has reviewed the transcripts, and argues all the inferences supporting his

10   point of view.  However, pursuant to the standards set forth above, this court must view the

11   evidence in the light most favorable to the prosecution.  The question is whether any rational trier

12   of fact could have found the gun was real.  As set forth above, there was sufficient evidence that

13   the gun was real.  Mr. Prestwich, the robbery victim, testified that he had experience with

14   firearms (RT168-69), and that the gun pointed at him during the robbery had a hollow barrel (RT

15   273-75).  Prestwich testified that at one point petitioner told the victim:  "I'm not kidding.  I will

16   shoot you if I have to," (RT 119), and that the gun "looked real."  (RT 176.)  Mr. Prestwich

17   testified that during the robbery, he was "getting freaked out . . . 'cause with the cold eyes and

18   everything.  I'm not sure whether this guy is just going to go ahead and jack the hammer on me."

19   (RT 119.)  In addition, the pursuing police officers testified that they heard a gunshot from a real

20   gun during their pursuit of petitioner.  (RT 191-93; 231-32.)  Moreover, despite petitioner's

21   argument that during the police interrogation he never claimed the gun was real, he also did not

22   claim the gun was fake until much later in the interrogation.  (LE 2B at 24.)  In addition, the jury

23   could draw inferences from petitioner's actions:  if the gun was fake, there was no need to toss it

24   out the window or to wear gloves to protect against gun residue testing.

25          Finally, in ruling on petitioner's motion for new trial, the trial court noted that the issue

26   was whether or not petitioner used a firearm or not during the commission of the robbery, and

27   ruled as follows:

28   ////

1

2

> The only thing in record that might weigh some validity to the claim of the [petitioner] that it was a fake gun is his words about three-quarters of the way through his statement that it was a fake, and that is in light of his entire statement, which is just filled with contradictions and lies, not under oath, but first he denies everything, then he admits one thing, then he denies another. And in no time until he can see, in my view, the string running out on this interview does the issue of fake come up, but that is in contrast from the People's evidence from the victim who said the gun was real.
>
> It's also contradicted by the police officers who during the chase of the [petitioner] would state that they heard what in their experience was the firing of a weapon, so that is very strong substantial evidence, and in my view supports the jury's finding. And my review of that evidence leads me to the same conclusion, that there's a substantial evidence of the record that supports the jury's verdict, and on that basis I'm going to deny the motion for new trial.

3

4

5

6

7

8

9

10

11 (RT 502-03.)[4]  This ruling by the trial court supports the decision by appellate counsel not to

12 challenge the sufficiency of the evidence on appeal, as well as this court's finding that any

13 rational trier of fact could have found the essential elements of the gun enhancement beyond a

14 reasonable doubt.

15      Because the undersigned finds that there was sufficient evidence to support the jury's

16 verdict that the gun was real, petitioner cannot demonstrate prejudice under Strickland.  The

17 decision by appellate counsel to press only claims that counsel believed, in her professional

18 judgment, had more merit than the claim suggested by petitioner was "within the range of

19 competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397 U.S. 759,

20 771 (1970).  Thus, the state court's denial of the ineffective assistance of counsel claim was not

21 contrary to, or an unreasonable application of, clearly established Supreme Court authority.

22 ////

23 ////

24 ////

25 _____

[4]  Under California law, evidence is sufficient to prove the use of a firearm "where there is some type of display of the weapon, coupled with a threat to use it which produces fear of harm in the victim."  People v. Dominguez, 38 Cal. App. 4th 410, 421 (1995).  "Circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm."  People v. Monjaras, 164 Cal. App. 4th 1432, 1436 (2008).  "Accordingly, jurors 'may draw an inference from the circumstances surrounding the robbery that the gun was a not a toy.'"  Id. at 1437 (citation omitted).

26

27

28

1  VI.  <u>Conclusion</u>

2         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

3  habeas corpus be denied.

4         These findings and recommendations are submitted to the United States District Judge

5  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6  after being served with these findings and recommendations, any party may file written

7  objections with the court and serve a copy on all parties.  Such a document should be captioned

8  "Objections to Magistrate Judge's Findings and Recommendations."   If petitioner files

9  objections, he shall also address whether a certificate of appealability should issue and, if so, why

10  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

11  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

12  § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

13  service of the objections.  The parties are advised that failure to file objections within the

14  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

15  F.2d 1153 (9th Cir. 1991).

16  Dated:  October 17, 2014

17

18  /acco2619.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

19
20
21
22
23
24
25
26
27
28